IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MICHAEL TED LAMB | § | |
| TDCJ-CID #790214 | § | |
| v. | § | C.A. NO. C-11-027 |
| | § | |
| RICHARD CRITES, ET AL. | § | |

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff is an inmate in the Texas Department of Criminal Justice, Correctional Institutions Division ("TDCJ"), who is currently incarcerated at the McConnell Unit in Beeville, Texas. Proceeding pro se, he filed a civil rights action pursuant to 42 U.S.C. § 1983, alleging that Defendants retaliated against him for bringing a prior lawsuit against prison officials at the McConnell Unit. (D.E. 1). Pending is Defendants' motion for summary judgment. (D.E. 56). Plaintiff has filed a response in opposition. (D.E. 67). On January 5, 2012, Defendants submitted a reply. (D.E. 68). For the reasons that follow, Defendants' motion for summary judgment is granted in part and denied in part. Plaintiff's retaliation claims against Defendants Jameson and Hassette for damaging and depriving him of his property will proceed to trial on the merits.

## I. JURISDICTION

The Court has federal question jurisdiction over this civil rights action pursuant to 28 U.S.C. § 1331. Upon consent of the parties, (D.E. 8, 28), the case was referred to a United States Magistrate Judge to conduct all further proceedings, including entry of final judgment. (D.E. 30); see also 28 U.S.C. § 636©.

## II. PROCEDURAL HISTORY

On February 2, 2011, Plaintiff initiated this action against (1) Warden Richard Crites; (2) Major Adam Gonzales; (3) Captain Jacqulyn Jameson; and (4) Officer Lisa Hassette. (D.E. 1).

His claims of retaliation against Captain Jameson and Officer Hassette for searching his property and attempting to initiate a cell transfer were retained on March 29, 2011.  Lamb v. Crites, No. C-11-027, 2011 WL 1230143 (S.D. Tex. Mar. 29, 2011) (unpublished).  All his other claims against the remaining defendants were dismissed.  Id.  On April 18, 2011, Plaintiff filed a motion to reconsider the dismissal of his claims against Warden Crites and Major Gonzales.  (D.E. 16).  This motion to reconsider was granted on April 29, 2011.  Lamb v. Crites, No. C-11-027, 2011 WL 1668063 (S.D. Tex. Apr. 29, 2011) (unpublished).  All claims against Warden Crites were reinstated, along with the property search and cell transfer claims against Major Gonzales.  Id. at *4.

Defendants Jameson and Hassette filed their answer on May 4, 2011, (D.E. 22), while Defendants Crites and Gonzales filed their answer on June 7, 2011.  (D.E. 25).  On October 18, 2011, Defendants collectively submitted this motion for summary judgment.  (D.E. 56).  Plaintiff responded with a brief opposing summary judgment on December 19, 2011.  (D.E. 67).

### III.  PLAINTIFF'S ALLEGATIONS

Plaintiff accuses Defendants, who are prison staff at the McConnell Unit, of engaging in various acts of retaliation against him for filing a previous lawsuit against his custodians, thereby violating his First Amendment right to access the court system.  Specifically, he alleges that Defendants Crites, Gonzales, Jameson, and Hassette unfairly reassigned him to hazardous living quarters; Defendant Crites and Gonzales coerced him to move by threatening to report him for major disciplinary actions; Defendants Jameson and Hassette were involved in unlawfully confiscating his property and returning it in poor condition; and Defendant Crites prevented him from accessing his trust account without justification.

## IV.  DOCUMENTED SUMMARY JUDGMENT EVIDENCE

Defendants offer the following documents in support of their motion for summary judgment:

Ex. A:  Relevant Portions of Plaintiff's Classification Records with business records affidavit;

Ex. B:  A Relevant Portion of Plaintiff's Classification/Disciplinary Records with business records affidavit;

Ex. C:  A Relevant Portion of Plaintiff's Classification/Housing Assignment Records with business records affidavit;

Ex. D:  Relevant Portions of Plaintiff's Grievance Records with business records affidavit;

Ex. E:  Affidavit of Mary Alford; and

Ex. F:  Affidavit of Richard Crites.

In response to Defendants' summary judgment motion, Plaintiff offers his sworn statement, (D.E. 67, at 22-25), the affidavits of McConnell Unit inmates Daniel Taylor, id. at 9-12, and Juarez Bibbs, id. at 12-13, as well as the affidavits of his sisters Carol Elswick, id. at 14, and Barbara Thomas.  Id. at 15-16.  In addition, he has provided the building turnout roster for the McConnell Unit dated on June 6, 2010.  Id. at 18-19.  He has also included a Step 2 grievance submitted on November 8, 2010 complaining about various acts of retaliation that had occurred in the prior months, including the incidents forming the basis of this action.  (D.E. 1, at 10-11).

The summary judgment evidence, including the Plaintiff's testimony at the Spears hearing, establishes the following:

In May 2010, Plaintiff, represented by counsel, went to trial in Lamb v. Mendoza, No. C-07-449 (S.D. Tex.), in which he raised Eighth Amendment claims that several defendants were deliberately indifferent to his serious medical needs because they ignored his complaints about

the noise levels at the "4 building" of the McConnell Unit, where he was confined, and also failed to provide appropriate medical care for his injured hearing.  Warden Crites was a defendant in that lawsuit.  After several days of testimony, the jury found that Plaintiff did suffer a serious medical need, and that certain medical personnel defendants were deliberately indifferent to his needs in violation of the Eighth Amendment.  Nevertheless, the jury concluded that the medical defendants were not the cause of Plaintiff's injury, and on June 4, 2010, the Court entered judgment that Plaintiff take nothing on his claims.  Following the completion of the jury trial, Plaintiff was returned to custody at the McConnell Unit.  (D.E. 56, at 2).

On the morning of June 7, 2010, Plaintiff's housing assignment was changed from his cell in 19Y to 4E21, which was in the "4 building," on the authority of an officer with the initials "JJJ."  (D.E. 60, at 3).  Within the day, however, he was reassigned to his old cell at 19Y by an official with the initials "RLC."  Id.

On June 21, 2010, Plaintiff submitted a Step 1 grievance regarding the events of that night.  (D.E. 56-4, at 5).  He claimed that the attempted cell transfer and the attendant seizure of his property constituted acts of retaliation "for exercising my 1st amend. rights," and he specifically named Warden Crites, Captain Jameson, Major Gonzales, and Officer Hassette as participants in the scheme to punish him for filing the previous lawsuit.  Id.  In addition, he complained that his wrongly seized property was returned to him in poor condition and that certain items were missing.  Id.  The affidavits of Daniel Taylor and Juarez Bibbs supplement Plaintiff's account of the attempted housing transfer and the condition of his partially returned property.  (D.E. 67, at 9-10, 12-13).

Warden Jackson rejected Plaintiff's Step 1 grievance on July 29, 2010 following an investigation into his claims.  (D.E. 56-4, at 6).  During the investigation, Captain Jameson,

4

Officer Barfoot, and Captain Puentes were interviewed.  Id. at 8-13.  Captain Jameson indicated that Plaintiff's property was inventoried because "he was leaving the facility" and that "this act was not in retaliation."  Id. at 9.  Officer Barfoot did not recall taking Plaintiff's property, but did return it to him in compliance with orders.  Id. at 10.  Captain Puentes confirmed that he inventoried Plaintiff's property, but declared that he "ha[d] no reason to not inventory any items that were there."  Id. at 12.  He further noted that Plaintiff previously informed him that he was missing a calculator, and that he found no calculator among Plaintiff's belongings.  Id.  The "Offender Property Inventory" sheet indicates that an "E. Garcia" also participated in the inventory process, as well as another unknown person who served as a "staff witness."[1]  Id. at 13.  Plaintiff's signature appears inside the signature box of the inventory sheet.  Id.  On the basis of these statements and the inventory sheet bearing Plaintiff's signature, the investigation concluded that his property was properly returned.

Plaintiff filed a Step 2 grievance questioning the quality of the investigation and the investigator's impartiality.  Id. at 3.  Specifically, he protested the lack of attention given to his retaliation claim and argued that the fact that he signed the inventory sheet merely meant he agreed that only those items inventoried were returned to him.  Id.  Because no inventory sheet was given to him at the time his property was seized, he reasoned that he could not have known what was lost.  Id.  On August 20, 2010, Assistant Regional Director J.M. Garcia affirmed the findings of the investigation and denied Plaintiff's Step 2 grievance because "[Plaintiff] failed to provide evidence to support [his] allegations."  Id. at 4.

Meanwhile, Plaintiff had been charged by Officer Olazaba with leaving his cubicle on July 6, 2010 even though his unit was under lockdown at that time.  (D.E. 56-1, at 4).  A

---

[1] The name of the "staff witness" is illegible as written on the inventory sheet.  Defendants have not identified this person.

disciplinary hearing was held on July 15, 2010, and the hearing officer found Plaintiff guilty and assessed ten days loss of both recreation and commissary privileges. Id. at 3. The result of this disciplinary proceeding is not being contested.

On August 18, 2010, Plaintiff was able to go to commissary, but found that he could not use his commissary card to make purchases from his trust account. (D.E. 67, at 25). His sister, Barbara Thomas, recounts that she called the Court and was informed that there was a hitherto unknown judgment against Plaintiff for court costs totaling $4,154.02.[2] Id. at 16. Plaintiff's Step 2 grievance complaining about this incident was dismissed by J.M. Garcia on December 13, 2010 because "Ms. Perez contends that your ID card was disabled for court filing fees by Inmate Trust Fund in Huntsville." (D.E. 1, at 11).[3]

TDCJ records indicate that Plaintiff's card had been disabled on August 6, 2010 by Mary Alford, an accountant working in the Commissary and Trust Fund Account Office in Huntsville, Texas. (D.E. 56-5, at 4). Her affidavit does not reference court filing fees. Instead, she avers that this "was a mistake on my part" and that she "was not instructed by Assistant Warden Richard Crites to do so." Id. at 2-3. In turn, Defendant Crites affirms that he "only became aware of Plaintiff's problem with accessing his account when his sister called and notified me at the McConnell Unit." (D.E. 58, at 2). When Ms. Alford was notified about the situation on August 19, 2010, she reactivated Plaintiff's card. (D.E. 56-5, at 3-4).

_____

[2] These court costs, Lamb v. Mendoza, No. C-07-449, were later vacated.

[3] Although no copies of Plaintiff's Step 1 grievance regarding the commissary card dispute were submitted to the Court, Defendants have not presented an exhaustion defense and the TDCJ's response to his Step 2 grievance references the Step 1 grievance. (D.E. 1, at 11).

# V.  DISCUSSION

Defendants move for summary judgment, arguing that they are entitled to qualified immunity.  (D.E. 56).

## A.      The Legal Standard For A Summary Judgment Motion.

Summary judgment is appropriate when there is no disputed issue of material fact, and one party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Courts must consider the record as a whole, including all pleadings, depositions, affidavits, interrogatories and admissions on file, in the light most favorable to the non-movant.  Caboni v. Gen. Motors Corp., 278 F.3d 448, 451 (5th Cir. 2002) (citations omitted).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact and informing the court of the basis for its motion by identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which support its contention.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Skotak v. Tenneco Resins, Inc., 953 F.2d 909, 913 (5th Cir. 1992) (citations omitted).  Any controverted evidence must be viewed in the light most favorable to the non-movant, and all reasonable doubts must be resolved against the moving party.  See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990); Williams v. Adams, 836 F.2d 958, 960 (5th Cir. 1988) (citation omitted).

If the moving party makes the required showing, then the burden shifts to the non-movant to show that a genuine issue of material fact remains for trial.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986); Fields v. City of S. Houston, Tex., 922 F.2d 1183, 1187 (5th Cir. 1991) (citation omitted).  The non-movant cannot merely rest on the allegations of the pleadings, but must establish that there are material controverted facts in order

to preclude summary judgment.  Fed. R. Civ. P. 56(e); <u>Anderson v. Liberty Lobby, Inc.</u>, 477

U.S. 242, 248-49 (1986) (citation omitted).  Summary judgment is proper if the non-movant fails

to make a showing sufficient to establish the existence of an element essential to his case on

which he bears the burden of proof.  <u>Celotex</u>, 477 U.S. at 322-23; <u>ContiCommodity Servs., Inc.</u>

<u>v. Ragan</u>, 63 F.3d 438, 441 (5th Cir. 1995) (citations omitted).

**B.      Plaintiff Has Failed To Allege That Certain Defendants Were Personally Involved
         In Efforts To Retaliate Against Him.**

It is well established that "[p]ersonal involvement is an essential element of a civil rights

cause of action."  <u>Thompson v. Steele</u>, 709 F.2d 381, 382 (5th Cir. 1983) (citing <u>Rizzo v. Goode</u>,

423 U.S. 362, 371-72, 377 (1976)).  A state actor may be liable under § 1983 only if she "was

personally involved in the acts causing the deprivation of [plaintiff's] constitutional rights or a

causal connection exists between an act of the official and the alleged constitutional violation."

<u>Douthit v. Jones</u>, 641 F.2d 345, 346 (5th Cir. 1981) (per curiam) (citation omitted).

Additionally, supervisory officials cannot be held liable under § 1983 for the actions of

subordinates on any theory of vicarious liability.  <u>See</u> <u>Monell v. Department of Soc. Servs.</u>, 436

U.S. 658, 691-95 (1978) (repudiating vicarious liability in the context of § 1983 actions); <u>accord</u>

<u>Bennett v. City of Slidell</u>, 728 F.2d 762, 767 (5th Cir. 1984) (en banc) (per curiam).  "Only the

direct acts or omissions of government officials, not the acts of subordinates, will give rise to

individual liability under § 1983."  <u>Coleman v. Houston Indep. Sch. Dist.</u>, 113 F.3d 528, 534

(5th Cir. 1997).  For a supervisory official to be held liable, they must "affirmatively participate

in the acts that cause constitutional deprivation" or "implement unconstitutional policies that

causally result in plaintiff's injury."  <u>Mouille v. City of Live Oak, Tex.</u>, 977 F.2d 924, 929 (5th

Cir. 1992).

1.    **Plaintiff has properly alleged the personal involvement of Defendants Jameson and Hassette in perpetrating retaliatory measures that resulted in the damage and deprivation of his property.**

Defendants argue that they cannot be held responsible for any purported damage or loss that may have occurred to Plaintiff's property during the inventory process. They specifically refer to the fact that the TDCJ investigation did not implicate them in any wrongdoing and emphasize that no named Defendant was involved in taking inventory of Plaintiff's property. (D.E. 56, at 9).

Plaintiff's claims for retaliatory destruction of his property are properly maintained against Defendants Jameson and Hassette. He alleges that at around 3:00 a.m. on June 7, 2010, he observed Defendant Jameson telephone someone and shout "take that son of a bitches [sic] property, and you know what to do with it!" (D.E. 1, at 6). After hanging up, she told another officer that "assholes like [Plaintiff] have to be taught a lesson about messing with us" and then informed Plaintiff that "we are going to make an example out of you." Id. Soon thereafter, he saw Defendant Hassette handling his property in a "very rough manner." Id. At around 6:00 a.m., Officer Barfoot and Defendant Hassette returned his property in poor condition. Id. In the process, Defendant Hassette allegedly "slung" his property into the cubicle and told him "[y]ou get what you deserve." Id.

After considering the record in favor of the non-moving party, Caboni, 278 F.3d at 451, Plaintiff's factual allegations sufficiently implicate Defendants Jameson and Hassette in the retaliatory destruction of his property. Defendant Jameson's statements suggest that she directly ordered other people to mishandle his property during the inventory process. Although Defendant Jameson denies making such statements in her answer, (D.E. 22, at 2), this dispute

constitutes a genuine issue of material fact that must be resolved at trial.  <u>Matsushita Elec. Indus.</u> <u>Co.</u>, 475 U.S. at 585-87.  Similarly, the allegations that Defendant Hassette actually handled Plaintiff's property, returned it in poor condition, and told him that he deserved such treatment permit the inference that she was personally responsible for damaging or losing his property.  As such, Defendant Hassette's denial also makes summary judgment inappropriate because it creates a genuine issue of material fact regarding her involvement in any purported act of retaliation.

> **2.      Plaintiff fails to allege that Defendants Crites and Gonzales were personally involved in causing damage to or losing his property.**

Plaintiff has failed to allege that Defendants Crites and Gonzales were personally involved in collecting or mishandling his property.  According to his pleadings, both Defendants make their first appearances no earlier than 8:00 a.m. on June 7, 2010–well after his property was inventoried and returned to him at 6:00 a.m.  (D.E. 1, at 6).  The record also does not disclose any instance in which either Defendants Crites or Gonzales personally played a role in losing or damaging Plaintiff's property.  Moreover, any attempt to maintain these claims against Defendants Crites and Gonzales solely by virtue of their supervisory capacities over the McConnell Unit is foreclosed.  <u>See</u> <u>e.g.</u>, <u>Monell</u>, 436 U.S. at 691-95; <u>Bennett</u>, 728 F.2d at 767. Therefore, Plaintiff cannot pursue his claims regarding the damage to or loss of his property against Defendants Crites and Gonzales and those claims are dismissed.

> **3.      Plaintiff cannot maintain a § 1983 claim against Defendant Crites for deactivating his commissary card.**

Plaintiff also complains that his commissary card was deactivated by Defendant Crites for retaliatory purposes.  He alleged that on August 18, 2010, he attempted to make commissary

10

purchases when he discovered that his card was no longer usable.  Id. at 7.  Because his unit had been on lockdown for an extended period of time, he was particularly distressed by his inability to access his inmate trust fund account.  Id. at 11; (D.E. 67, at 25).  Ms. Perez, the commissary supervisor, placed a call to have his account reactivated, but she was told that it had been frozen "because [Plaintiff] might owe [the TDCJ] money in the future."  (D.E. 67, at 25).  On September 7, 2010, his sister Barbara Thomas called the custodians of the Inmate Trust Fund at Huntsville, Texas and was told that they had never placed a hold or freeze on his trust account.  (D.E. 67, at 15).  A few days later, Plaintiff was able to make purchases with his commissary card again.[4]  (D.E. 1, at 7).

Defendants counter that Plaintiff's claim cannot succeed because Defendant Crites did not cause his commissary card to be rendered inoperable.  (D.E. 56, at 10).  In support of this contention, they present testimony by Defendant Crites and Mary Alford, as well as an "I.D. Card Status History Inquiry" report indicating that she was the one who disabled his account.  Id. at 9-10; (D.E. 56-5, at 3-4; D.E. 58, at 2).  These documents establish that Ms. Alford erroneously disabled his commissary card on August 6, 2010 and reactivated it upon learning of her mistake on August 19, 2010.  (D.E. 56-5, at 2-3).  She also explicitly testifies that Defendant Crites never instructed her to disable Plaintiff's account.  Id. at 3.  Defendant Crites denies preventing Plaintiff from using his commissary card and avers that he only became aware of this issue when Plaintiff's sister called him.  (D.E. 58, at 2).

_____

[4] Defendants do not argue that Plaintiff's claim regarding the disabling of his commissary card fails because it would be a de minimis retaliatory act, and there is no reason to so hold.  See Hart v. Hairston, 343 F.3d 762, 764 (5th Cir. 2003) (per curiam) (loss of twenty-seven days of commissary and cell restrictions were not de minimis); Andrade v. Hauck, 452 F.2d 1071, 1071-72 (5th Cir. 1971) (restriction of commissary privileges is not de minimis in a prisoner retaliation claim).

In response, Plaintiff merely expresses his disbelief at the notion that his commissary card could be disabled due to a simple mistake.  (D.E. 67, at 4).  He argues that it is extremely unlikely that this could have happened to him out of thousands of inmates, and claims that he has never heard of any inmate having their commissary card mistakenly disabled.  Id.  Plaintiff also refers to Ms. Perez's inconsistent explanation that his card was disabled pending the collection of fees as reason to doubt the veracity of Ms. Alford's affidavit.  He then concludes that Ms. Alford is covering up for Defendant Crites.  Id.

Such speculative objections cannot be used to overcome a properly supported summary judgment motion.  Plaintiff submits no additional affidavits or admissible evidence tending to support his counter-argument that Ms. Alford has provided a false affidavit.  Indeed, there is no evidence in the record to establish that Defendant Crites had any role in disabling the commissary card.  Therefore, he has failed to "set out specific facts showing a genuine issue for trial," as required by Rule 56(e)(2) of the Federal Rules of Civil Procedure.  See also Anderson, 477 U.S. at 249 ("in the face of the defendant's properly supported motion for summary judgment, the plaintiff could not rest on his allegations ... to get to a jury without 'significant probative evidence tending to support the complaint'") (quoting First Nat. Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 290 (1968)).  Defendant Crites is entitled to summary judgment, and Plaintiff is not entitled to a jury trial on his claim that Defendant Crites prevented him from making commissary purchases.

12

**C.      Defendants Are Entitled To Qualified Immunity On Certain Claims For Retaliation.[5]**

The doctrine of qualified immunity affords protection against individual liability for civil damages to officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  When a defendant invokes the defense of qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense.  McClendon v. City of Columbia, 305 F.3d 314, 323 (5th Cir. 2002) (en banc) (per curiam) (citation omitted).  "To discharge this burden, a plaintiff must satisfy a two-prong test."  Atteberry v. Nocana Gen. Hosp., 430 F.3d 245, 253 (5th Cir. 2005).  "First, he must claim that the defendants committed a constitutional violation under current law.  Second, he must claim that defendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of."  Id. (citations omitted).  While it will often be appropriate to conduct the qualified immunity analysis by first determining whether a constitutional violation occurred and then determining whether the constitutional right was clearly established, that ordering of the analytical steps is no longer mandatory.  Pearson, 555 U.S. at 236-37 (receding from Saucier v. Katz, 533 U.S. 194 (2001)).

**1.      Step 1 – Plaintiff has established a constitutional violation.**

To prevail on a § 1983 claim for retaliation, "'a prisoner must establish (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her

---

[5] Defendants also invoke Eleventh Amendment immunity regarding any claims in their official capacity. (D.E. 56, at 3-4).  Plaintiff, however, has explicitly denied suing them in their official capacity.  (D.E. 67, at 1).  Nonetheless, if Plaintiff's action could be construed as suing them in their official capacity, that claim is necessarily against the State and, as such, is barred by the Eleventh Amendment.  See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 146 (1993).

exercise of that right, (3) a retaliatory adverse act, and (4) causation.'" Morris v. Powell, 449 F.3d 682, 684 (5th Cir. 2006) (quoting McDonald v. Steward, 132 F.3d 225, 231 (5th Cir. 1998)). The Fifth Circuit has explained that "[t]he purpose of allowing inmate retaliation claims under § 1983 is to ensure that prisoners are not unduly discouraged from exercising their constitutional rights." Id. at 686 (citing Crawford-El v. Britton, 523 U.S. 574, 588 n.10 (1998)). At the same time, the Fifth Circuit has emphasized that "[p]risoners' claims of retaliation are regarded with skepticism and are carefully scrutinized by the courts." Adeleke v. Fleckenstein, 385 F. App'x 386, 387 (5th Cir. 2010) (per curiam) (unpublished) (citing Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir. 1995)). An inmate must allege more than his personal belief that he is the victim of retaliation. Johnson v. Rodriguez, 110 F.3d 299, 310 (5th Cir. 1997) (citation omitted). "Mere conclusory allegations of retaliation will not withstand a summary judgment challenge. The inmate must produce direct evidence of motivation or, in the more probable scenario 'allege a chronology of events from which retaliation may plausibly be inferred.'" Woods, 60 F.3d at 1166 (citations omitted).

> **a)   Plaintiff has alleged the violation of a specific constitutional right.**

The First Amendment confers upon prisoners "a constitutional right of access to the courts that is 'adequate, effective, and meaningful.'" Terry v. Hubert, 609 F.3d 757, 761 (5th Cir. 2010) (quoting Bounds v. Smith, 430 U.S. 817, 822 (1977)). In order to protect this right, the Fifth Circuit has held that "a prison official may not retaliate against or harass an inmate for exercising the right of access to the courts, or for complaining to a supervisor about a guard's misconduct." Woods, 60 F.3d at 1164 (citations omitted).

Plaintiff charges Defendants with retaliating against him for suing prison officials for

civil rights violations in federal court.  (D.E. 1, at 6).  Such an allegation states a violation of his

First Amendment right of access to the courts, as recognized by <u>Woods</u>.  He has therefore

established that a specific constitutional right is at stake.[6]

### b)    Plaintiff has sufficiently established retaliatory intent.

Defendants submit that there is no indication of retaliatory intent.  (D.E. 56, at 6-7).

While they acknowledge that Plaintiff had previously filed a lawsuit, they assert that it was

"illogical" for them to have been motivated by retaliatory intent because he had already "lost his

lawsuit" by the time the incidents occurred.  <u>Id.</u>  Moreover, Defendants Crites and Jameson

explicitly disclaim any retaliatory motive for their actions.  (D.E. 56-4, at 9; D.E. 58, at 2).

Despite Defendants' protests, Plaintiff has alleged a chronology of events supporting the

inference that they possessed the requisite retaliatory intent.  <u>Woods</u>, 60 F.3d at 1166.  He claims

that after his trial against various TDCJ officials was completed on June 4, 2010, he was ordered

by an officer to pack his property on the night of June 6, 2010 because he was being transferred

to another unit.  (D.E. 56-4, at 5).  The next morning Officer Barfoot allegedly came to

Plaintiff's cell to inventory his property.  <u>Id.</u>  After inquiring about why he was being

transferred, he was told that Captain Jameson was ultimately trying to take his property.  <u>Id.</u>

While Plaintiff was waiting by the "4 gym" on Captain Jameson's orders, he overheard her shout

"take that son of a bitches [sic] property, and you know what to do with it!" over the phone.

(D.E. 1, at 6).  She then turned to another officer and said "assholes like [Plaintiff] have to be

---

[6] To the extent his complaint could be construed as lodging a claim of unconstitutional deprivation of property without the due process afforded him by the Constitution, any such claim would require him to establish that he was given no adequate post-deprivation remedy.  <u>Hudson v. Palmer</u>, 468 U.S. 517, 533 (1984).  Because Texas provides an adequate post-deprivation remedy, <u>Murphy v. Collins</u>, 26 F.3d 541, 543-44 (5th Cir. 1994), this due process claim is not actionable pursuant to § 1983.

taught a lesson about messing with us." <u>Id.</u> On his way back to his dorm, Captain Jameson told him that "we are going to make an example out of you." <u>Id.</u>

Officers Barfoot and Hassette then allegedly returned Plaintiff's property in poor condition. (D.E. 1, at 6). After asking about his property, Officer Hassette told him "[y]ou get what you deserve." <u>Id.</u> Officer Tavares then told him to prepare to move back to the "4 building" and that Captain Jameson had reported him for creating a disturbance. <u>Id.</u> Major Gonzales was called in and allegedly stated that he did not want Plaintiff's "kind" in his dorm. <u>Id.</u>; (D.E. 20, at 8). At some point, Officer Tavares told Plaintiff that Major Gonzales was threatening to institute two major disciplinary cases if he did not move. (D.E. 1, at 6). Plaintiff refused to move; as a result, he was then taken to "11 building" for confinement. (D.E. 56-4, at 6). A little over an hour later, Warden Crites spoke to Plaintiff at the "11 building" and sent him back to "19 building" along with his property. <u>Id.</u>

As alleged, these events give rise to a plausible inference that Defendants Gonzales, Jameson, and Hassette retaliated against Plaintiff for filing the previous lawsuit. Defendants' contention that they possessed no retaliatory motive because Plaintiff lost his lawsuit fails to address the possibility that they still might wish to punish Plaintiff for having sued TDCJ officials. Even though Plaintiff was unable to collect damages from that prior action, he was nevertheless able to convince a jury that his Eighth Amendment rights were violated by certain medical personnel. It is further plausible that Defendants wanted to discourage Plaintiff and other potential claimants from exercising their right to file lawsuits against employees at the McConnell Unit, particularly due to the close outcome of the prior case.

TDCJ records also suggest, and Defendants confirm, that Defendant Jacqulyn Jameson

16

was the officer with the initials "JJJ" who arranged for Plaintiff's transfer back to the "4 building."[7]  (D.E. 60, at 3; D.E. 68, at 3).  Given that the "4 building" was the loud dormitory area where Plaintiff sustained the injury to his hearing which formed the basis of his prior lawsuit, such a transfer occurring mere days after the conclusion of the jury trial raises justified inferences of retaliatory activity.  Defendants have not claimed they were unaware of the trial, and they have not submitted any affidavits to that effect.

Based on these allegations and information, a retaliatory motive to chill Plaintiff (and potentially other inmates) from filing future lawsuits may therefore be inferred from the alleged statements and actions of the various prison officials during the incident: Defendant Jameson's assignment of Plaintiff to the "4 building," her command to seize his property, and her remark about making him into an example for his transgressions against them; Defendant Hassette's statement that he was getting what he deserved; and Defendant Gonzales' verbal threats to coerce him into moving back to the "4 building" as well as the comment about not wanting his "kind" in the dorm.  Based on existing authority from the Supreme Court and the Fifth Circuit, the alleged statements and actions of Defendants Gonzales, Jameson, and Hassette support a finding that they possessed retaliatory intent for the purposes of this summary judgment motion.

It is also plausible to believe that Defendant Crites possessed retaliatory intent because he was a defendant in the previous lawsuit filed by Plaintiff.  The notion that a previously named

---

[7] Defendants offer an alternative explanation for why Defendant Jameson initiated the transfer.  They assert that she temporarily reassigned Plaintiff to the "4 building" because Plaintiff had created a disturbance, and they insist that this move was not prompted by any retaliatory animus.  (D.E. 68, at 3).  Defendants, however, fail to describe the nature of the alleged disturbance.  Moreover, this excuse is belied by Defendant Jameson's own statement during the TDCJ investigation that "[Plaintiff] was leaving the facility."  (D.E. 56-4, at 9).  This explanation conflicts with the evidence and testimony presented by Plaintiff.  Such a dispute of facts is for the jury to decide.

defendant may possess a retaliatory motive to harass a prisoner-plaintiff has been taken seriously by other courts.  See Romero v. Quarterman, No. 4:08-CV-414-A, 2009 WL 1904814, at *1-2 (N.D. Tex. July 2, 2009) (unpublished) (dismissing a retaliation claim where plaintiff alleged that he had previously filed a lawsuit against the defendant only after finding insufficient evidence indicating that the previous lawsuit was meritorious); Samford v. Staples, No. H-06-0279, 2006 WL 2052871, at *6 (S.D. Tex. July 21, 2006) (unpublished) (dismissing a retaliation claim for lack of retaliatory intent because plaintiff had not sued defendant in a previous lawsuit); but see Simpson v. Epps, No. 5:10cv15, 2010 WL 4063727, at *3 (S.D. Miss. Oct. 15, 2010) (unpublished) (dismissing a retaliation claim where current defendant was a named defendant in a prior case because "there is no evidence that Plaintiff [suffered retaliation] for filing his [prior] complaint" and for failure to establish the causation prong).  Because Plaintiff's prior lawsuit was sufficiently meritorious that it proceeded to trial and Defendant Crites was in fact a named defendant in that action, it is plausible to conclude that he could have wanted to retaliate.  In the absence of any other facts touching on whether retaliatory intent existed aside from Defendant Crites' assertions to the contrary, it would be inappropriate to grant summary judgment at this juncture.  Although all Defendants deny making any incriminating statements and disclaim possessing any retaliatory intent, such a dispute constitutes a genuine issue of material fact that operates to preclude summary judgment on this issue.  Celotex, 477 U.S. at 323.

       **c)**      **Plaintiff has established a retaliatory adverse act only as to the loss and damage to his property.**

Because it is well established that prison officials may not retaliate against a prisoner for exercising the right to file lawsuits and administrative grievances, actions that might not

18

otherwise be offensive to the Constitution can give rise to a constitutional claim if taken in retaliation for the exercise of the protected conduct.  <u>Woods</u>, 60 F.3d at 1165 ("An action motivated by retaliation for the exercise of a constitutionally protected right is actionable, even if the act, when taken for a different reason, might have been legitimate.") (citations omitted).  However, the Fifth Circuit has explained that retaliation is actionable only if the retaliatory act "'is capable of deterring a person of ordinary firmness from further exercising his constitutional rights.'"  <u>Bibbs v. Early</u>, 541 F.3d 267, 270 (5th Cir. 2008) (quoting <u>Morris</u>, 449 F.3d at 686).  Some acts, even though they may be "motivated by retaliatory intent, are so *de minimis* that they would not deter the ordinary person from further exercise of his rights."  <u>Morris</u>, 449 F.3d at 686.  "Such acts do not rise to the level of constitutional violations and cannot form the basis of a § 1983 claim."  <u>Id.</u>  For example, a job transfer from the commissary to the kitchen might be <u>de minimis</u>, while a transfer to a more dangerous unit might constitute an adverse retaliatory act.  <u>Id.</u> at 687.

> **i.    The attempted cell transfer was a <u>de minimis</u> act of retaliation.**

Defendants argue that Plaintiff cannot show that the attempted cell transfer constituted a retaliatory act because he was moved back to his cell at 19Y within hours of reassignment and suffered no injury during the incident.  (D.E. 56, at 8).  Nowhere did Plaintiff ever allege that he was actually physically transferred to the "4 building."  Instead, he acknowledges that he was confined at the "11 building" before being sent back to 19Y by Defendant Crites.  (D.E. 1, at 7).  Consequently, it appears that the only harm Plaintiff can claim is that he was forced to endure the heat while at the "11 building."  <u>Id.</u>

Plaintiff's temporary cell reassignment falls well short of actionable retaliation.  The

Fifth Circuit in <u>Morris</u> did not consider a temporary assignment to an unpleasant work station as amounting to anything more than a <u>de minimis</u> act that would not have deterred the plaintiff from exercising his First Amendment right to file grievances.  449 F.3d at 687.  Even though the <u>Morris</u> plaintiff was forced to work in the kitchen for a week and spend one day in the objectionable "pot room," the court declared that the mere experience of discomfort for a limited amount of time was not sufficient to establish a retaliatory adverse act.  <u>Id.</u>  In contrast, the Fifth Circuit has found actionable retaliation where the prisoner is forced to endure extreme hardship, or is subjected to a greater risk of bodily harm.  <u>See</u> <u>Bibbs</u>, 541 F.3d at 272 (subjecting inmate to below-freezing temperatures for more than four hours on four consecutive nights was not <u>de minimis</u>); <u>Parker v. Carpenter</u>, 978 F.2d 190, 192-93 (5th Cir. 1992) (transfer from low-risk minimum security section of jail to the overcrowded violent inmate section was actionable retaliation); <u>Jackson v. Cain</u>, 864 F.2d 1235, 1239, 1248 (5th Cir. 1989) (transfer from light labor job to a feed lot involving dangerous and intense work was treated as an actionable claim for retaliation).

Because Plaintiff spent less than two hours confined in the "11 building" and never moved into the "4 building," he has not shown that the attempted cell reassignment would deter him or any person of ordinary firmness from further exercising their constitutional rights.  <u>Bibbs</u>, 541 F.3d at 270 (citation omitted).  He has suffered no injury and was not subjected to an elevated risk of harm.  Although being forced to stay in a hot cell is unpleasant, nothing in the record indicates that he suffered any more than the <u>Morris</u> plaintiff, who was forced to endure an undesirable work station for a day and relegated to kitchen duties for a week.  Accordingly, Plaintiff fails to show that his attempted cell reassignment qualifies as a retaliatory adverse act,

20

and Defendants' motion for summary judgment regarding this claim is granted.

      **ii.**      **The threats of disciplinary proceedings were <u>de</u> <u>minimis</u>.**

      Plaintiff's alleges that Defendants threatened him with potential disciplinary actions in order to force him to move to the "4 building." (D.E. 1, at 6-7). However, they contend that verbal threats alone cannot constitute an adverse act, and they point out that Plaintiff has never received a major disciplinary case in connection with the June 7, 2010 events. (D.E. 56, at 7).

      The Fifth Circuit has held that "[m]ere allegations of verbal abuse do not present actionable claims under § 1983." <u>Bender v. Brumley</u>, 1 F.3d 271, 274 n.4 (5th Cir. 1993). In the context of retaliation claims, courts have declined to find actionable retaliation where an officer's threats were not realized. <u>See</u> <u>Arita v. Stagg</u>, No. 09-0158, 2010 WL 370343, at *6 (M.D. La. Jan. 29, 2010) (unpublished) (alleged retaliatory conduct consisting of threats and verbal abuse was <u>de</u> <u>minimis</u>); <u>Cobb v. Simmons</u>, No. 2:09-CV-0034, 2009 WL 2016072, at *10-11 (N.D. Tex. July 9, 2009) (unpublished) (threats implying that a major disciplinary action will be brought was <u>de</u> <u>minimis</u> for purposes of retaliation analysis). Only where officials actually institute disciplinary proceedings for retaliatory purposes do such adverse actions amount to actionable retaliation. <u>See</u> <u>Hart</u>, 343 F.3d at 763-64 (disciplinary action brought in retaliation for plaintiff's filing of a grievance was actionable).

      Plaintiff has not presented the Court with any showing that major disciplinary actions were brought against him in the aftermath of the attempted cell transfer. He has also disavowed claiming that "any case was ever written against him," and he has made clear that he was only "told cases were or would be written against him." (D.E. 16, at 4-5). Moreover, the record indicates that he was only involved in one disciplinary action in the year 2010, wherein he was

21

charged by Officer Olazaba on July 6, 2010 for leaving his cubicle while his unit was under

lockdown.  (D.E. 56-1, at 3-4).  This disciplinary proceeding is unrelated to the incident that

Plaintiff complains about, and he makes no allegations to the contrary.  Given that Plaintiff has

only claimed that Defendants issued verbal threats rather than actual disciplinary proceedings, he

therefore fails to state anything more than de minimis acts.  Accordingly, Defendants' motion for

summary judgment regarding this claim is granted.

### iii.    Purposeful damage and destruction of property is a retaliatory adverse act.

Defendants maintain that the inventorying of Plaintiff's property, which allegedly

resulted in loss or damage to certain items, did not constitute an adverse retaliatory act.  (D.E.

56, at 8).  They further point out that Plaintiff signed an inventory sheet for the property when it

was returned to him, indicating that he received all the listed items.  Id. at 9.

The Fifth Circuit has recognized that the loss of personal property through a retaliatory

scheme perpetrated by prison officials is a retaliatory adverse act.  See Leggett v. Comer, 280 F.

App'x 333, 336 (5th Cir. 2008) (per curiam) (unpublished) (a prisoner who alleged that prison

officials deprived him of $11,000 in personal property in response to his letter-writing campaign

stated a retaliation claim) (citing Morris, 449 F.3d at 684-85).  Plaintiff has alleged just such a

loss of personal property, and Defendants have failed to counter by showing that the interference

with Plaintiff's property was not an adverse retaliatory act.[8]

---

[8] Plaintiff claims that a number of items were missing, including a calculator, two bags of coffee, eight
cappuccinos, and headphones.  (D.E. 56-4, at 6).  He also claims that other items were returned in poor condition,
including a pair of headphones, various food items, and his legal papers were in disarray.  While Defendants do not
argue that this amounts to a de minimis loss, at least one other court has found that the cost of replacing small items
may be sufficient to deter a "person of ordinary firmness" from exercising his constitutional rights in the future.  See
Crawford-El v. Britton, 93 F.3d 813, 826 (D.C. Cir. 1996) (citation omitted), vacated on other grounds, 523 U.S. 574
(1998).

The fact that Plaintiff signed the inventory sheet for his property when it was returned does not diminish the viability of his claims.  He does not contest the fact that he received the listed items on the inventory sheet.  (D.E. 56-4, at 3).  Rather, he protests the condition in which the items were returned to him, and he complains that other items not listed on the sheet were missing.  Id.  The signature box for the inventory sheet merely provides that inmates who sign have "reviewed the above inventory of my personal property and it is correct."  Id. at 13.  This affirmation only means that the signing party received the property listed in the inventory sheet; it does not mean that the property returned to the signing party matched the property given to the TDCJ to inventory.  As Plaintiff points out in his Step 2 grievance, TDCJ officials never gave him an inventory sheet when his property was initially taken.  Id.  Without any initial inventory sheet tabulating the items received from the Plaintiff, for purposes of the pending motion, Defendants can neither establish that nothing was lost during the inventory process, nor can they demonstrate that he never possessed the property that he now claims is lost.[9]

---

[9] Defendants argue that Plaintiff has failed to prove that he ever possessed the allegedly missing property.  (D.E. 56, at 9).  As the summary judgment standard specifies, however, the Court must construe the record, including the pleadings, in the light most favorable to the non-moving party.  Caboni, 278 F.3d at 451.  The party opposing a motion for summary judgment is only required to respond with proof not derived from the pleadings when such a motion is properly supported by countervailing evidence.  Fed. R. Civ. P. 56(e)(2).  Unless and until the moving party makes a properly supported motion for summary judgment, the non-moving party may therefore rely on his pleadings.

In support of the motion for summary judgment, Defendants only present the unsworn statement of Captain Puentes, who inventoried Plaintiff's property, to show that Plaintiff did not possess all of the property he claims is now lost.  He declared that Plaintiff had already informed him that he was missing a calculator before he took inventory of the property.  (D.E. 56-4, at 12).  Even if Captain Puentes' testimony is considered admissible to prove the truth of the matter asserted, Plaintiff has responded with an affidavit from a fellow inmate, Juarez Bibbs, who avers that he "witnessed [Plaintiff] use his calculator daily, but after this day I never seen him use his calculator again.  It was not until he bought another one from commissary did I see him use a calculator again."  (D.E. 67, at 13).  Given that there is a genuine issue of material fact regarding whether Plaintiff possessed the calculator prior to the inventory process, summary judgment would still be inappropriate.

       **d)**     **Plaintiff has sufficiently established causation for retaliatory deprivation of his property.**

The Fifth Circuit has explained that "[c]ausation requires a showing that 'but for the retaliatory motive the complained of incident ... would not have occurred.'"  McDonald, 132 F.3d at 231 (quoting Johnson, 110 F.3d at 310).  In determining whether the retaliatory motive caused the retaliatory act, the Fifth Circuit has taken into account the temporal proximity between the inmate's exercise of his First Amendment right provoking the retaliation and the retaliatory act itself.  See Bibb, 541 F.3d at 273-74 (acknowledging that temporal proximity is a factor in finding causation, but permitting a retaliation claim to proceed even though defendants committed adverse acts a month after exercising his First Amendment rights after considering the incriminating comments of the guards).

Construing the record in the non-movant's favor, Plaintiff has set forth facts suggesting that Defendant Jameson ordered her subordinates to damage or deprive him of his property, (D.E. 1, at 6), and that Defendant Hassette contributed to the damage by handling his property roughly.  (D.E. 67, at 24).  Moreover, this incident occurred just days after his court proceeding against other employees at the McConnell Unit had concluded, id., thus forging a temporally proximate connection between Plaintiff's exercise of his First Amendment right and the complained-of retaliatory act.  Although Defendants refer to TDCJ policy requiring officials to inventory the property of inmates who are moving to another unit, the typical inventory process does not result in damage to or the loss of the inmate's property.  Defendants therefore fail to demonstrate that Plaintiff would have experienced this same outcome in the absence of retaliatory motive.

Accordingly, for the purposes of this summary judgment motion, Plaintiff sufficiently

establishes causation, along with the other three elements of retaliation.  He therefore satisfies

his burden on the first prong of the qualified immunity analysis with respect to his retaliation

claim against Defendants Jameson and Hassette.

> **2.      Step 2 – Plaintiff has sufficiently shown that Defendants acted in an objectively unreasonable manner.**

Because Plaintiff meets his burden on the first step of the qualified immunity inquiry as

to his claim for the retaliatory deprivation of his property, it is necessary to examine the

second.[10]  At this juncture, a plaintiff must articulate the asserted constitutional right more

specifically.  Thompson v. Upshur County, Tex., 245 F.3d 447, 460 (5th Cir. 2001).  Thus,

"when the defendant moves for summary judgment based on qualified immunity, it is the

plaintiff's burden to demonstrate that all reasonable officials similarly situated would have

known that the alleged acts of the defendants violated the United States Constitution."  Id.

(citation omitted).  For a right to be clearly established under the second step of the qualified

immunity analysis, "[t]he contours of the right must be sufficiently clear that a reasonable officer

would understand that what he is doing violates that right."  Anderson v. Creighton, 483 U.S.

635, 640 (1987).

Under the second step, "[t]he relevant, dispositive inquiry in determining whether a right

is clearly established is whether it would be clear to a reasonable officer that his conduct was

unlawful in the situation he confronted."  Saucier, 533 U.S. at 202 (citing Wilson v. Layne, 526

U.S. 603 (1999)).  Even officers who interpret the law mistakenly but reasonably are entitled to

---

[10] Given that Plaintiff has failed to state a constitutional violation regarding the aborted cell transfer attempt and the verbal threats of retaliation, the Court need not examine whether Defendants' actions were reasonable as to those remaining claims.  See Saucier, 533 U.S. at 201 (if the facts alleged do not establish that the officer's conduct violated a constitutional right, then the qualified immunity analysis need proceed no further and qualified immunity is appropriate).

immunity.  See Creighton, 483 U.S. at 641.  The purpose of the "clearly established law" requirement is to avoid retroactive application of "newly created legal standards" to state actors who had no reason to know they were exposing themselves to liability.  Mouille, 977 F.2d at 928 (citing Harlow, 457 U.S. at 819).

With respect to Plaintiff's sole viable claim for retaliatory damage or loss of his property, Defendants insist that the evidence shows that they acted in an objectively reasonable manner because they did not possess any motive for retaliation given that Plaintiff lost in the previous lawsuit, the property was inventoried pursuant to TDCJ rule, and Plaintiff did not prove that he owned the alleged missing property.  (D.E. 56, at 11).  This response, however, is simply a rehash of the same arguments they raised when attempting to show that Plaintiff did not establish a constitutional violation for retaliation.

The right to be free from retaliation for the exercise of the right to access the courts was well-established at the time of the events relevant to this action.  See, e.g., Woods, 60 F.3d at 1164.  Defendants do not provide case law that supports the destruction or loss of Plaintiff's property as alleged here.  Because the summary judgment evidence could be viewed by the trier of fact to support Plaintiff's account of Defendants' actions as being objectively unreasonable, he satisfies his burden on the second prong of the qualified immunity inquiry.  Defendants Jameson and Hassette are therefore not entitled to qualified immunity on the retaliatory deprivation of property claim.

## VI.  CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment, (D.E. 56), is GRANTED in part and DENIED in part.  Consistent with this Order, Plaintiff's claim against

Defendants Jameson and Hassette for the retaliatory damage or loss of his property shall proceed to trial.  All other claims are dismissed.

ORDERED this 14th day of January 2012.


BRIAN  L. OWSLEY
UNITED STATES MAGISTRATE JUDGE